IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DavCo. Acquisition
Holding, Inc., et al.,

        Plaintiffs,

        v.                          Case No. 2:07-cv-1064

Wendy's International,
Inc., et al.,

        Defendants.

OPINION AND ORDER

        This is a diversity action filed by plaintiffs DavCo
Acquisition Holding, Inc. and DavCo Restaurants, Inc. ("DavCo"),
against defendants Wendy's International, Inc. ("Wendy's") and
Wendy's National Advertising Program, Inc. ("WNAP").  Defendant
Wendy's International is an Ohio corporation and the franchisor of
Wendy's Old Fashioned Hamburger Restaurants.  WNAP is an Ohio
corporation which was formed by Wendy's to receive and allocate
contributions received from Wendy's restaurants for national
advertising.  Plaintiffs are Delaware corporations and franchisees
of Wendy's.  In this action, plaintiffs assert claims for breach of
contract and unjust enrichment under Ohio law.  This matter is
before the court on the defendants' motion to dismiss plaintiffs'
claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a
claim for which relief may be granted.

I. Standards for Motion to Dismiss

        In ruling on a motion to dismiss under Rule 12(b)(6), the
court must construe the complaint in a light most favorable to the
plaintiff, accept all well-pleaded allegations in the complaint as
true, and draw all reasonable inferences in favor of the plaintiff.

<u>Directv, Inc. v. Treesh</u>, 487 F.3d 471, 476 (6th Cir. 2007); <u>Evans-Marshall v. Board of Educ. of Tipp City Exempted Village School Dist.</u>, 428 F.3d 223, 228 (6th Cir. 2005).

A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. <u>Mezibov v. Allen</u>, 411 F.3d 712, 716 (6th Cir. 2005). While the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. <u>Bell Atlantic Corp. v. Twombly</u>, ____ U.S. ___, 127 S.Ct. 1955, 1964-65 (2007); <u>Campbell v. PMI Food Equipment Group, Inc.</u>, 509 F.3d 776, 780 (6th Cir. 2007). A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." <u>Twombly</u>, 127 S.Ct. at 1974.

Plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action, <u>Twombly</u>, 127 S.Ct. at 1965, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986); <u>see also</u>, <u>Mezibov</u>, 411 F.3d at 716 (conclusory allegations or legal conclusions masquerading as factual allegations will not suffice). A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. <u>Rauch v. Day & Night Mfg. Corp.</u>, 576 F.2d 697 (6th Cir. 1978).

In evaluating a motion to dismiss, the court may consider a document or instrument which is attached to the complaint, or which is referred to in the complaint and is central to the plaintiff's claim.  Fed.R.Civ.P. 10(c)("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997).  In addition, if extrinsic materials merely "fill in the contours and details" of a complaint, such materials may be considered without converting the motion to one for summary judgment.  Yeary v. Goodwill Indus-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997).  Here, defendants have submitted the franchise agreement referred to in plaintiffs' complaint.  Plaintiffs have submitted a letter concerning matters alleged in the complaint which fill in the contours of the complaint, and another letter which they submit as an example of evidence which may be obtained in discovery.  Therefore, the court sees no need to convert the motion to one for summary judgment.

II. Plaintiffs' Complaint

Plaintiffs' claims relate to provisions in the Wendy's franchise agreement, specifically: (1) the requirement concerning the sale of products approved by Wendy's, in this case, Coca-Cola beverages; and (2) the requirement that franchisees contribute a percentage of the gross revenue from their restaurants to WNAP.

By way of background, plaintiffs state in their complaint that DavCo first entered into a franchise agreement with Wendy's in 1975.  DavCo Acquisition Holding acquired DavCo in 1998, and became a Wendy's franchisee at that time.  The most recent franchise agreement was signed by plaintiffs on August 13, 2003.

Prior to 1998, franchisees were permitted to engage in open bidding to purchase fountain beverage syrup from a variety of companies. On December 18, 1998, DavCo and Coca-Cola Fountain ("CCF"), a unit of The Coca-Cola Company ("Coca-Cola"), negotiated and entered into an agreement whereby DavCo agreed to sell Coca-Cola products exclusively until the earlier of a date specified or the purchase of a certain volume of fountain beverage syrup. In 1998, Wendy's disapproved The Pepsi-Cola Company ("Pepsi") as a supplier of fountain beverage syrup, and mandated the sale of Coca-Cola products by franchises which did not have an existing contractual relationship with Pepsi.

In February of 2006, DavCo estimated that the volume requirement in its contract with CCF would be satisfied in November or December of 2007, and notified Wendy's, CCF and Pepsi of its intention to conduct open bidding for a new fountain beverage syrup supply contract. In response, Wendy's wrote plaintiffs to advise them that CCF was the only approved fountain beverage syrup supplier for the Wendy's system. Since the franchise agreement permits franchisees desiring to purchase products from an unapproved supplier to submit a written request to Wendy's for approval to do so, DavCo requested in August of 2006 that it be permitted to solicit bids from Pepsi as well as other beverage syrup providers. In October of 2006, Wendy's responded by stating that CCF was the only approved supplier of fountain beverage syrup for Wendy's restaurants. In March of 2007, Wendy's sent another letter stating that Coca-Cola syrup and Pepsi syrup were not equivalent products since each was made from a different secret formula, and reiterating its refusal to approve Pepsi as an

4

alternative supplier. Plaintiffs then renewed their request to solicit bids from Pepsi, but this request was not answered. Plaintiffs allege in Count I that Wendy's failed to adequately consider plaintiffs' request to solicit bids from Pepsi or to investigate Pepsi as a potential supplier, and that this failure resulted in a breach by Wendy's of the franchise agreement.

Plaintiffs further allege that under the terms of the franchise agreement, franchisees are required to expend an amount equal to four percent of the franchisee's monthly gross sales on advertising. Fifty to seventy-five percent, as directed by Wendy's, must be contributed to WNAP. From 1975 through the present, Wendy's has directed that amounts ranging from two percent to three percent of gross revenue be contributed to WNAP for national advertising. Plaintiffs allege that Wendy's and CCF entered into a secret agreement whereby CCF agreed to contribute funds to WNAP based on each gallon of fountain beverage syrup purchased by franchisees.[1] Plaintiffs allege that the cost of beverage syrup purchased by plaintiffs is artificially increased by the amount of CCF's contributions to WNAP.

In Count II of the complaint, plaintiffs assert a breach of contract claim against Wendy's. Plaintiffs allege that since Wendy's does not credit their obligation to WNAP with the amount contributed to WNAP by CCF, the failure to credit, in combination with the alleged inflated price for syrup, resulted in them paying

---

[1]The date of this agreement is not alleged in the complaint. However, plaintiffs have submitted, as an attachment to their response to defendants' motion to dismiss, a letter to Wendy's franchisees dated August 18, 1998, notifying them of an agreement reached on that date between Wendy's and CCF. The letter further advised franchisees that CCF was the only approved supplier of fountain beverages in the Wendy's restaurant system, and Pepsi was no longer on the approved supplier list.

more to WNAP than they are contractually obligated to pay under the franchise agreement. In Count III of the complaint, plaintiffs allege that these excess payments to WNAP resulted in the unjust enrichment of Wendy's and WNAP.

III. Plaintiffs' Claims

A. Count I - Breach of Contract

In Count I, plaintiffs assert a claim for breach of contract under Ohio law. In order to establish a cause of action for breach of contract, plaintiffs must demonstrate by a preponderance of the evidence that: (1) a contract existed, (2) the plaintiffs fulfilled their obligations, (3) Wendy's failed to fulfill its obligations, and (4) damages resulted from this failure. Lawrence v. Lorain Cty. Community College, 127 Ohio App.3d 546, 548-49, 713 N.E.2d 478 (1998).

Construction of a written contract is a matter of law to be determined by the court. Latina v. Woodpath Development Co., 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991); Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146 (1978). As a general rule, contracts should be construed so as to give effect to the intention of the parties. Aultman Hosp. Ass'n v. Community Mut. Ins. Co., 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). In construing a contract, a court "must give meaning to every paragraph, clause, phrase, and word, omitting nothing as meaningless, or surplusage" and must consider the subject matter, nature, and purpose of the agreement." Affiliated FM Insurance Co. v. Owens-Corning Fiberglas Corp., 16 F.3d 684, 686 (6th Cir. 1994)(applying Ohio law). Where the terms of an existing contract are clear and unambiguous, the court "cannot create a new contract

6

by finding an intent not expressed in the clear and unambiguous language of the written contract." Hamilton Insurance Services, Inc. v. Nationwide Insurance Cos., 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999).  The court cannot make contracts for others and may not read language or terms into a contract. Uram v. Uram, 65 Ohio App.3d 96, 99, 582 N.E.2d 1060 (1989).

Under the terms of the franchise agreement, plaintiffs agreed to sell products "as conform to Franchisor's written standards and specifications, and to refrain from deviating therefrom by the use or offer of any non-conforming items, without Franchisor's prior written consent[.]  Franchise Agreement, §6.11.A.  Plaintiffs agreed to sell only products "as have been expressly approved for sale in writing by Franchisor[.] Franchise Agreement, §6.11.B. Plaintiffs further agreed "to discontinue selling and offering for sale any menu items, products or services which Franchisor may, it its discretion, disapprove in writing at any time." §6.11.B.

The Franchise Agreement further provides:

Franchisee shall purchase all food items, ingredients, supplies, materials, and other products used or offered for sale at the Restaurant solely from suppliers (including manufacturers, distributors, and other sources) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. If Franchisee desires to purchase any products from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval. Franchisee shall not purchase from any supplier until, and unless, such supplier has been approved in writing by Franchisor.  Franchisor shall have the right to require that Franchisor or its agents be permitted to inspect the

7

supplier's facilities, and that samples from the supplier
be delivered, either to Franchisor or to an independent
laboratory designated by Franchisor for testing.  A
charge not to exceed the reasonable cost of the
inspection and the actual cost of the test shall be paid
by the Franchisee or the supplier.  Franchisor may also
require that the supplier comply with such other
requirements as Franchisor may deem appropriate,
including payment of reasonable continuing inspection
fees and administrative costs.  Franchisor reserves the
right, at its option, to reinspect from time to time the
facilities and products of any such approved supplier and
to revoke its approval upon the supplier's failure to
continue to meet any of Franchisor's then-current
criteria.  Nothing in the foregoing shall be construed to
require Franchisor to approve any particular supplier,
nor to require Franchisor to make available to
prospective suppliers, standards and specifications for
formulas that Franchisor, in its sole discretion, deems
confidential.

Franchise Agreement, §6.12.

Plaintiffs first argue that Wendy's breached the franchise
agreement because it did not apply "criteria" allegedly contained
in the franchise agreement in determining whether to approve a new
supplier.  Plaintiffs allege in the complaint that Wendy's did not
inspect Pepsi's facilities, obtain samples of Pepsi's product for
testing, analyze the ability of Pepsi to meet Wendy's standards and
specifications for fountain beverage syrup, or determine whether
Pepsi possesses adequate quality controls and capacity to supply
plaintiffs' needs promptly and reliably.

Although §6.12 of the franchise agreement states that Wendy's
"shall have the right" to inspect the proposed supplier's
facilities or to obtain samples for testing or laboratory analysis,
this language simply grants Wendy's the right to investigate the
proposed supplier.  There is no express language in the agreement
which imposes any duty on Wendy's to perform any of these acts each

8

time a supplier is proposed by a franchisee.

Plaintiffs also note the obligation of franchisees to purchase only from suppliers "who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably[.]" Franchise Agreement, §6.12.  Plaintiffs argue that this language should be read as obligating Wendy's to apply these "criteria" to every proposed supplier, and that the failure to so construe this provision would render the above language surplusage.  However, defendants correctly note that this sentence, when read in its entirety, imposes a duty on franchisees to purchase only from approved suppliers which meet Wendy's standards.  The recitation of these standards is relevant in the context of the franchisee's obligations and would not be rendered mere surplusage if plaintiffs' interpretation of the agreement is rejected.

The noted language imposes no express duty on Wendy's to investigate or apply any particular criteria in evaluating a proposed supplier.  The agreement contains no wording requiring Wendy's to consider factors such as whether the supplier meets Wendy's then-current standards and specifications for its products, or whether the supplier has adequate quality controls and capacity to supply a franchisee's needs promptly and reliably.  The agreement also contains no language requiring Wendy's to explain its reasons for rejecting a proposed supplier.  In fact, §6.12 of the franchise agreement specifically provides: "Nothing in the foregoing shall be construed to require Franchisor to approve any

particular supplier, nor to require Franchisor to make available to prospective suppliers, standards and specifications for formulas that Franchisor, in its sole discretion, deems confidential." The unambiguous language of §6.12 provides that Wendy's has no duty to approve a proposed supplier.

Plaintiffs argue nonetheless that Wendy's obligation to follow the alleged "criteria" should be inferred under the doctrine of "expressio unius est exclusio alterius." That doctrine provides "that the expression in a contract of one or more things of a class implies the exclusion of all not expressed[.]" Uram, 65 Ohio App.3d at 99. Plaintiffs note that §6.12 specifically refers only to Wendy's rights to inspect the supplier's facilities, obtain and test samples, and reject the proposed supplier. Plaintiffs contend that because the franchise agreement contains no specific language giving Wendy's the right not to apply the "criteria" in considering a franchisee's request to use a supplier, Wendy's cannot now claim that it has such a right.

The real gist of plaintiffs' argument is that, based on this omission from the list of rights, the parties must have intended that Wendy's have a duty to apply the "criteria." However, the doctrine of expressio unius requires looking at classes of things, and rights and duties are not in the same class. Recognizing this, plaintiffs, through the use of artful language, have attempted to reclassify what is essentially a matter of duty or obligation as the absence of a right not to perform the duty. Since the real issue is whether Wendy's has a duty to apply the "criteria," it is likely that the parties would have spoken in terms of duty or obligation in addressing such a matter in the franchise agreement.

10

Even the sentence in §6.12 containing the alleged "criteria" refers to things the "[f]ranchisee shall" do, _i.e._, duties on the part of the franchisee.

No duty on the part of Wendy's to consider the "criteria" is included among the obligations of the franchisor mentioned in the agreement. Thus, application of the doctrine of <u>expressio unius</u> results in the conclusion that the parties to the franchise agreement did not intend for Wendy's to have a duty to consider any particular criteria in addressing a franchisee's request to use an unapproved supplier.

Another principle of contract interpretation also dictates this conclusion. A written contract which appears to be complete and unambiguous on its face will be presumed to embody the final and complete expression of the parties' agreement. <u>Fontbank, Inc. V. Compuserve, Inc.</u>, 138 Ohio App.3d 801, 808, 742 N.E.2d 674 (2000). "This presumption is strongest where a written agreement contains a merger or integration clause expressly indicating that the agreement constitutes the parties' complete and final understanding regarding its subject matter." <u>Id</u>. Where "the parties following negotiations make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." <u>Aultman Hosp. Ass'n</u>, 46 Ohio St.3d at 55. In this case, the franchise agreement states: "This Agreement and the documents referred to herein constitute the entire, full, and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof[.]" Franchise Agreement, §23. In light of the

11

unambiguous language of the agreement and the presence of the integration clause, this court will not read into the agreement a duty on the part of Wendy's which is not stated in the agreement.

Plaintiffs also argue that Wendy's has an obligation to apply the alleged "criteria" under the implied duty of good faith and fair dealing. Under Ohio law, there is an implied duty of good faith in almost every contract. <u>Littlejohn v. Parrish</u>, 163 Ohio App.3d 456, 462, 839 N.E.2d 49 (2005). The duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract. <u>Id</u>. at 463. Good faith "'is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties[,]'" but the obligation "'is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.'" <u>Ed Schory & Sons, Inc. v. Society National Bank</u>, 75 Ohio St.3d 433, 662 N.E.2d 1974 (1996)(quoting <u>Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting</u>, 908 F.2d 1351, 1357 (7th Cir. 1990).

The duty of good faith and fair dealing may not be invoked to override express contract terms. <u>Stephenson v. Allstate Insurance Co.</u>, 328 F.3d 822, 826 (6th Cir. 2003); <u>Interstate Gas Supply, Inc. v. Calex Corp.</u>, No. 04AP-980 (10th Dist. unreported), 2006 WL 328679 at *20 (Ohio App. Feb. 14, 2006)(citing <u>Hamilton Ins. Serv.</u>, 86 Ohio St.3d at 274 ("There can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself."). When a written contract is plain and

12

unambiguous, it is not subject to attack based on standards of good faith and fair dealing merely because its operation will work a hardship on one party and accord advantage to the other.  <u>Aultman Hosp. Ass'n</u>, 46 Ohio St.3d at 55.

In addition, the implied covenant of good faith and fair dealing does not apply where a party to the contract has the absolute and exclusive authority to make the decision at issue. <u>See</u> <u>Stephenson</u>, 328 F.3d at 827 (holding that because any decision concerning the transfer of accounts between insurance agents rested exclusively with the defendant, "the contract presumed no discretion and, thereby, removed any basis upon which to imply a covenant of good faith and fair dealing."); <u>Adams v. LCI International ??Telecom Corp.</u>, No. 99AP-1199 (10th Dist. unreported), 2000 WL 1006043 (Ohio App. July 20, 2000)(rejecting argument that defendant had a good faith obligation to make reasonable efforts to develop sales leads provided by plaintiff where under terms of agreement, defendant had sole discretion whether to accept leads and no responsibility to accept or follow up on leads provided).  Similarly, in <u>Tubby's #14, Ltd. v. Tubby's Sub Shops, Inc.</u>, No. 04-70918 (unreported), 2006 WL 2796181 at *17 (E.D.Mich. Sept. 27, 2006), the court held that where the franchise agreement provided that all food products used by the franchisee "must meet the specifications and must be purchased from the approved supplier" and gave the franchisor the exclusive right to approve food products and suppliers, there was no basis for implying a covenant of good faith and fair dealing.

In this case, the franchise agreement expressly provides that nothing in §6.12 "shall be construed to require Franchisor to

approve any particular supplier." Since Wendy's has the absolute unilateral authority under the agreement to approve or disapprove suppliers, there is no basis for inferring a covenant of good faith and fair dealing in this case. In addition, plaintiffs had an obligation under the express terms of the franchise agreement to use suppliers "who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved." Franchise Agreement, §6.12. At the time of plaintiffs' request, Pepsi was a disapproved supplier.

Even if an obligation of good faith and fair dealing were applicable in this case, plaintiffs have failed to allege facts in their complaint sufficient to state a breach of contract claim based on the failure to act in good faith. According to the allegations in the complaint, Wendy's did not simply ignore plaintiffs' proposal or reject it with no consideration. Wendy's wrote to plaintiffs on two occasions to advise them that CCF was the only approved fountain beverage syrup supplier for the Wendy's system, and also sent a letter stating that Coca-Cola syrup and Pepsi syrup were not equivalent products since each was made from a different secret formula, and reiterating its refusal to approve Pepsi as an alternative supplier. The August 18, 1998, letter to franchisees submitted by plaintiffs discusses at length Wendy's decision to opt for a single supplier of fountain beverages and its reasons for choosing Coca-Cola to fill that role. In addition, this was not a situation where plaintiffs were proposing a new supplier unknown to Wendy's. Rather, Pepsi was a previous supplier which was disapproved at the time of plaintiffs' request.

14

Plaintiffs have failed to plead facts sufficient to raise their breach of contract claim based on the duty of good faith above the speculative level. <u>Twombly</u>, 127 S.Ct. at 1964-65.

Finally, plaintiffs argue that the franchise agreement is ambiguous as to Wendy's obligations in considering a request to use an unapproved supplier, and that plaintiffs may therefore rely on Wendy's course of conduct in advancing their interpretation of §6.12. However, they do not identify in their complaint any language in that section which is reasonably susceptible to more than one interpretation. The franchise agreement unambiguously states that "[n]othing in [§6.12] shall be construed to require Franchisor to approve any particular supplier." Franchise Agreement, §6.12.

Count I fails to allege a claim for breach of contract against Wendy's.

B. Count II - Breach of Contract

In Count II, plaintiffs allege that Wendy's has breached the franchise agreement by failing to give them credit against their WNAP contributions for contributions made by CCF tp WNAP. Plaintiffs also allege that the franchise agreement has been breached because plaintiffs have paid more in contributions than the amount specified in the franchise agreement. This allegation is based on the theory that CCF finances its contributions to WNAP by inflating the price of the beverage syrup it sells to plaintiffs, and therefore plaintiffs provide the funds for CCF's contributions.

WNAP is a company maintained and administered by Wendy's for the purpose of engaging in nationwide advertising for the Wendy's

15

system.  "WNAP is intended to maximize general public recognition, acceptance, and use of the System[.]"  Franchise Agreement, §11.5.A.  The franchise agreement requires plaintiffs to make payments to WNAP.  Under the agreement, Wendy's has the right to require plaintiffs to spend up to four percent of plaintiffs' gross sales during the preceding month on advertising and promotion. Franchise Agreement, §11.1.  Wendy's also has the authority under the agreement to specify that between fifty percent and seventy-five percent of that amount be contributed to WNAP for national advertising purposes.  Franchise Agreement, §11.1.A.

The franchisee letter of August 18, 1998, states that during Coca-Cola's first year as Wendy's soft drink partner, Coca-Cola agreed to contribute $42 million to WNAP as a one-time consolidation fund.  Coca-Cola also agreed to contribute to WNAP annually at a rate of thirty-two cents per gallon sold.[2]  The letter further states that Wendy's intended to use a portion of the first year contribution to decrease the WNAP payments owed by franchisees from 2.5 percent to 1.75 percent of gross sales from September, 1998, through February, 1999, after which the WNAP payments would return to their normal levels.

There is no language in the franchise agreement, express or otherwise, which automatically requires Wendy's to reduce the amount of franchisees' WNAP obligations by the amount of contributions made to WNAP by third parties such as Coca-Cola.  A like conclusion was reached by the court in Dunkin' Donuts Inc. v. N.A.S.T., Inc., No. 02 C 1272 (unreported), 2003 WL 1877626

---

[2]Although the letter does not specify, presumably this refers to gallons of soft drink syrup.

16

(N.D.Ill. April 11, 2003).  In that case, franchisees of Dunkin'
Donuts asserted a breach of contract claim contending that they
were entitled to a reduction in their advertising contributions due
to a marketing agreement under which Dunkin's sister brand Togo's
received a $1 million rebate from Pepsico.  The court held that
because the parties had never reached an agreement as to the
distribution of the rebate funds, the franchisees had no right to
share in the rebate.  Id. at *6.  Similarly, in Little Caesar
Enterprises, Inc. v. Smith, 895 F.Supp. 884, 899-900 (E.D.Mich.
1995), the court held that Little Caesar was entitled to summary
judgment on the franchisee's claim for breach of contract and the
covenant of good faith and fair dealing stemming from Little
Caesar's failure to credit them with rebates, discounts, and
bonuses paid by suppliers for advertising.

Plaintiffs argue that since Wendy's reduced their
contributions for six months following Coca-Cola's $42 million
contribution to WNAP, it would be contrary to common sense for
Wendy's to fail to continue to reduce their WNAP payments based on
Coca-Cola's contributions of thirty-two cents per gallon.  However,
the complaint identifies no language in the franchise agreement or
elsewhere which requires Wendy's to do so.  In fact, the agreement
expressly gives Wendy's the right to determine what percentage of
gross sales, up to four percent, must be devoted to advertising,
and what percentage of that figure, between fifty percent and
seventy-five percent, must be paid to WNAP.  Franchise Agreement,
§§11.1, 11.1.A.  Whether Wendy's voluntary business decision to
reduce franchisees' WNAP contributions for six months based on
Coca-Cola's substantial one-time contribution, but not to reduce

17

future contributions based on Coca-Cola's ongoing contributions, is sound or unsound is not a viable basis for plaintiffs' breach of contract claim.[3]

Plaintiffs also argue that Wendy's breached its duty of good faith and fair dealing in failing to give them credit. Plaintiffs allege that the franchise agreement was breached because plaintiffs subsidized Coca-Cola's contributions to WNAP through the inflated price they paid for beverage syrup, thereby resulting in plaintiffs paying more in WNAP contributions than the limit specified in the franchise agreements. Plaintiffs allege that "Wendy's was aware that its agreement with CCF to inflate the cost of the fountain beverage syrup to Plaintiffs and to use CCF as a conduit to require Plaintiffs to make the Excess Contributions ... was a breach of Wendy's Franchise Agreements with Plaintiffs, and resulted in a significant overpayment by Plaintiffs of their national advertising contribution obligation to WNAP." Complaint, ¶ 32.

The facts stated in the complaint are insufficient to allege a claim for breach of contract under a good faith theory. The complaint contains nothing more than conclusory allegations that the price paid by plaintiffs for syrup was inflated. Plaintiffs negotiated the price they pay for syrup, entering into their contract with Coca-Cola in December of 1998, and they were content to pay that price for almost nine years without complaint. The complaint asserts plaintiffs' mere speculations that Coca-Cola paid

---

[3]Plaintiffs have also submitted a letter dated August 20, 1998, from Pepsi to Wendy's, in which Pepsi offered an up-front contribution of $100 million in addition to 32 cents per gallon for advertising. Plaintiffs argue that Wendy's could not have entered into an agreement with Coca-Cola in good faith when Pepsi was offering better financial terms for WNAP advertising. Wendy's business decision to reject Pepsi's offer is totally irrelevant to whether Wendy's breached the WNAP contribution limits its franchise agreements with plaintiffs.

18

for its WNAP contributions by inflating the price of syrup sold to plaintiffs, but there are no facts alleged in support of this theory. See Twombly, 127 S.Ct. at 1964-65 (factual allegations in complaint must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim). In light of Wendy's agreement to make Coca-Cola its exclusive syrup provider, Coca-Cola was in a position to make concessions to the franchisees and to finance its WNAP contributions without raising the price of syrup, particularly since Coca-Cola also benefitted from the advertising activities of WNAP.

It was not a violation of the obligation of good faith and fair dealing for Wendy's to enter into an agreement with Coca-Cola for Coca-Cola to make contributions to WNAP. Wendy's was in a unique position to negotiate on behalf of all Wendy's franchisees to secure additional advertising revenue for WNAP which would benefit all franchisees. There are no facts in the complaint sufficient to allege that Wendy's and Coca-Cola engaged in an illegal price-fixing conspiracy, or that Wendy's received a kick-back or other funds from Coca-Cola as a result of the allegedly inflated price for syrup.

The facts contained in the complaint are otherwise insufficient to indicate that plaintiffs have paid more than the maximum WNAP contribution permitted under the franchise agreement. In contradiction to plaintiffs' conclusory allegations, the facts included in the complaint indicate that although Wendy's has the authority under the franchise agreement to mandate that franchisees contribute between fifty percent and seventy-five percent of the

four percent of gross revenue dedicated to advertising to WNAP, Wendy's has not always required payment of the full seventy-five percent.  From 1975 to 2000, the contribution to WNAP was two percent.  Complaint, ¶ 26.  In 2001, the required contribution was 2.5 percent, but the extra one-half percent was deferred for one year.  The contribution was increased to three percent in 2003, but again, the additional one percent was deferred for one year.  Complaint, § 29.  In addition, the contribution made by franchisees for six months from September, 1998, to February, 1999, was reduced from 2.5 percent to 1.75 percent in light of the initial contribution of $42 million made by Coca-Cola.  These facts highlight the conclusory and speculative nature of the complaint's allegations concerning excess contributions.

Count II of the complaint does not contain facts sufficient to "state a claim to relief" for breach of contract, either based on the express language of the franchise agreement or under a good faith theory, "that is plausible on its face."  <u>Twombly</u>, 127 S.Ct. at 1974.  Defendants' motion to dismiss Count II for failure to state a claim is well taken.

C. Count III - Unjust Enrichment

In Count III, plaintiffs allege that the failure to credit them for contributions made by Coca-Cola to WNAP results in unjust enrichment.  Although the caption of Count III refers only to WNAP, the text of that count refers to both WNAP and Wendy's as the recipient of the alleged unjust enrichment.

A claim for unjust enrichment is a contract implied in law, or a quasi-contract.  <u>Donald Harris Law Firm v. Dwight-Killian</u>, 166 Ohio App.3d 786, 790, 853 N.E.2d 364 (2006).  A quasi-contract is

not built on the intention of the parties, but on a duty imposed by law on one who would otherwise be unjustly enriched at the cost of another.  City of Cincinnati v. Cincinnati Reds, 19 Ohio App.3d 227, 230, 483 N.E.2d 1181 (1984).

To establish unjust enrichment, a plaintiff must show the following: (1) a benefit conferred upon defendant by plaintiff, (2) knowledge by defendant of the benefit, and (3) the acceptance or retention by defendant of the benefit under circumstances that make it inequitable for defendant to retain and benefit without payment of its value.  Hambleton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).  As to the third element, it is not sufficient that the defendant gain an enrichment; the enrichment must be unjust.  Chesnut v. Progressive Casualty Ins. Co., 166 Ohio App.3d 299, 308, 850 N.E.2d 751 (2006).  Because a plaintiff pursuing an unjust enrichment claim is seeking equitable remedies, the plaintiff must show a superior equity so that it would be unconscionable for the defendant to retain the benefit.  Id.; City of Cincinnati v. Fox, 71 Ohio App. 233, 239, 49 N.E.2d 69 (1943)(plaintiff "must show that under the circumstances it has a superior equity so that as against it it would be unconscionable for the defendant to retain the benefit.").

Under Ohio law, in the absence of fraud, illegality, or bad faith, a party may not recover under the theory of unjust enrichment when an express contract covers the same subject.  Aeral, S.R.L. v. PPC Airfoils, L.L.C., 371 F.Supp.2d 933, 943 (N.D.Ohio 2005)(citing Ullmann v. May, 147 Ohio St. 468, 72 N.E.2d 63 (1947)); Aultman Hosp. Ass'n, 46 Ohio St.3d at 55 (in the absence of fraud, illegality or bad faith, plaintiffs were entitled

21

to compensation only in accordance with the terms of the written integrated agreement); <u>Dwight-Killian</u>, 166 Ohio App.3d at 790 (absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment); <u>Pawlus v. Bartrug</u>, 109 Ohio App.3d 796, 800, 673 N.E.2d 188 (1996)(if an express agreement existed concerning the matter for which compensation is sought, the parameters of the agreement limit the parties' recovery).

Count III fails to allege a claim of unjust enrichment against Wendy's, because, under the terms of the franchise agreement, Wendy's does not benefit from the WNAP contributions. All contributions to WNAP are used for advertising purposes. Franchise Agreement, §11.5.B. All sums paid by franchisees to WNAP are maintained in an account separate from other funds of Wendy's, and may not be used to defray Wendy's expenses other than expenses related to the administration of WNAP and the implementation of WNAP advertising activities. Franchise Agreement, §11.5.C. WNAP and its earnings do not otherwise inure to the benefit of Wendy's, and Wendy's must maintain separate bookkeeping accounts for WNAP. <u>Id</u>. The agreement further provides that the "contributions to and earnings of WNAP are not and shall not be an asset of Franchisor." Franchise Agreement, §11.5.F. Thus, the complaint fails to allege how the WNAP contributions of either the plaintiffs or CCF conferred a benefit on Wendy's.

In addition, contrary to plaintiffs' argument, the franchise agreement does address the subject matter of the unjust enrichment claim, that being WNAP contributions. In their unjust enrichment claim, plaintiffs contend that the amount of their contributions to WNAP should be reduced by the amount per gallon contributed to WNAP

22

by Coca-Cola or CCF.  However, the franchise agreement specifically addresses the issue of WNAP contributions and provides that franchisees have an obligation to make contributions to WNAP in an amount dictated by Wendy's within a specified range.  The franchise agreement also provides that Wendy's is "not obligated, in administering WNAP, to make expenditures for the benefit of Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or <u>pro</u> <u>rata</u> from expenditures by WNAP[.]" Franchise Agreement, §11.5.A.  The franchise agreement contains no express provision for credit based on contributions to WNAP made by third parties.

The franchise agreement contains an express integration clause stating that it is the entire agreement of the parties.  There is no basis, either under the terms of the agreement or by inferring a covenant of good faith and fair dealing, of reading a duty to give credit for supplier contributions into the franchise agreement.  Plaintiffs' complaint contains no allegations sufficient to allege that the franchise agreement was the product of fraud, illegality or bad faith.  In light of the parties' unambiguous and integrated contract, plaintiffs are not entitled to credit under the theory of unjust enrichment.  <u>See</u> <u>Aultman Hosp. Ass'n</u>, 46 Ohio St.3d at 55 (rejecting plaintiffs' claims of unjust enrichment based on the integrated and unambiguous contract which described the compensation to be paid for services).

Plaintiffs argue that they are entitled to plead breach of contract and unjust enrichment in the alternative, as they have done in Counts II and III of the complaint.  That is certainly the

23

case. However, that does not mean that plaintiffs can circumvent the rule under Ohio law that the theory of unjust enrichment does not provide a basis for recovery where, as here, the subject matter of the unjust enrichment claim is addressed in an express contract between the parties. Plaintiffs do not allege in their complaint that they have no contract with Wendy's, or that their franchise agreements with Wendy's are invalid. Rather, they argue that since the matter of credit for supplier contributions is not specifically addressed in the franchise agreement, they may proceed on a quasi-contract theory. However, as discussed above, the court has determined that the matter of WNAP contributions is addressed in the franchise agreements. These integrated franchise agreements constitute the entire agreement of the parties on the subject of the amount of WNAP contributions, thus barring recovery under a theory of unjust enrichment in this case.

Defendants also argue that Count III must be dismissed because plaintiffs have failed to allege that they have a superior equity to WNAP. Plaintiffs respond that "superior equity" is not an element of unjust enrichment which must be pleaded in the complaint. However, the third element of an unjust enrichment claim requires the acceptance or retention by defendant of the benefit under circumstances that make it inequitable for defendant to retain and benefit without payment of its value. Hambleton, 12 Ohio St.3d at 183. Ohio courts have construed the term "inequitable" as meaning that the plaintiff must show a superior equity so that it would be unconscionable for the defendant to retain the benefit. Chesnut, 166 Ohio App.3d at 308; Fox, 71 Ohio App. at 239. Thus, the concept of "superior equity," as

24

interpreted by Ohio courts, is a part of and included within the third element of an unjust enrichment claim.

To survive a motion to dismiss, the complaint in this case must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under the theory of unjust enrichment. See Allen, 411 F.3d at 716. The complaint fails to allege even in the simplest of terms how plaintiffs have a superior equity over WNAP in the funds which Coca-Cola or CCF contributes to WNAP. The payments to WNAP are used exclusively to fund advertising, marketing, public relations, promotional programs, and other activities to promote the Wendy's restaurant system, of which the plaintiff franchisees are members. Franchise Agreement, §11.5.B. WNAP derives no personal benefit from these contributions, which are used exclusively for advertising which benefits franchisees such as plaintiffs. The complaint contains no allegations as to why it is inequitable for WNAP rather than plaintiffs to have the benefit of monetary contributions made by third party suppliers such as Coca-Cola, when these funds are used exclusively for advertising which benefits franchisees such as the plaintiffs.

The crux of plaintiffs' unjust enrichment claim is that it is unjust for Coca-Cola to finance its WNAP contributions in whole or in part by allegedly inflating the price it charges plaintiffs for fountain beverage syrup. There are no allegations in the complaint that Wendy's and WNAP have any control or input as to which funds Coca-Cola chooses to use to finance its WNAP contributions under the separate contribution agreement between Wendy's and Coca-Cola. Plaintiffs' quarrel concerning the price of syrup is with Coca-Cola

or CCF, not with Wendy's and WNAP.  Coca-Cola and CCF are not parties to this action.

Count III of the complaint fails to state a claim for unjust enrichment against Wendy's and WNAP.

IV. Conclusion

In accordance with the foregoing, the court concludes that the complaint lacks factual allegations sufficient to raise the claimed right to relief above the speculative level, to create a reasonable expectation that discovery will reveal evidence to support the claim, Campbell, 509 F.3d at 780, or to "state a claim to relief that is plausible on its face." Twombly, 127 S.Ct. at 1974.  The defendants' motion to dismiss for failure to state a claim for relief (Doc. No. 10) is granted, and this case is hereby dismissed.

Date: March 18, 2008          s\James L. Graham
                              James L. Graham
                              United States District Judge

26